Douglas Lipstone (SBN 141104)
doug@weinberg-gonser.com
Bryan Bitzer (SBN 324301)
bryan@weinberg-gonser.com
WEINBERG GONSER LLP
10866 Wilshire Blvd., Suite 1650
Los Angeles, CA 90024
Telephone:  (424) 239-2850
Facsimile:  (424) 238-3060

Attorneys for Plaintiff
Q AND SHU GLOBAL INDUSTRIES, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Q AND SHU GLOBAL INDUSTRIES, LLC, a Delaware limited liability company<br><br>Plaintiff,<br><br>vs.<br><br>THERE ONCE WAS A FERN INC., a California corporation; and ELIZABETH ALLEN, an individual,<br><br>Defendants. | Case No.:  2-19-cv-03293<br><br>**COMPLAINT FOR DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**<br><br>Case Filed: April 24, 2019 |

Plaintiff, Q and Shu Global Industries, LLC ("Plaintiff"), by and through its attorneys, brings this action and alleges against defendants There Once Was a Fern Inc. ("TOWF") and Elizabeth Allen ("Allen", and collectively "Defendants"), as follows:

## NATURE OF THE ACTION

1.     This is an action seeking declaratory judgment that: (1) Plaintiff is the sole owner of all right, title and interest in and to the podcast entitled, "Small Town Dicks" (the "Program"), including, without limitation, the copyright therein, and any and all other intellectual property rights thereto; (2) Plaintiff may fully exploit the Program without interference from Defendants; and (3) if Defendants have any rights in the

1  Program, they have licensed those rights to Plaintiff on terms consistent with the
2  Agreement (defined herein).  In correspondence sent to Plaintiff by Defendants' legal
3  counsel, Defendants allege that Allen is a co-creator of the Program and therefore,
4  Plaintiff may not exploit any rights in the Program without Allen's express consent.
5  Defendants have continued these allegations of ownership and threats to block the
6  exploitation of the Program.  Defendants' actions have harmed and will continue to
7  harm Plaintiff and its business.  As a result, Plaintiff seeks redress from this Court to
8  afford relief from Defendants' baseless and unfounded allegations.

9  ## JURISDICTION AND VENUE

10  2.     This Court has subject matter jurisdiction over this matter pursuant to the
11  Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*; 28 U.S.C. §§1331 and 1338.  The
12  claims alleged herein arise under The Copyright Act of 1976, Title 17 U.S.C. §101, *et*
13  *seq*.

14  3.     This Court has personal jurisdiction over Allen because Allen, by her
15  actions against Plaintiff, as detailed herein, has expressly aimed her activities at this
16  district, availing herself of this forum.

17  4.     This Court has personal jurisdiction over TOWF because, on information
18  and belief, TOWF is a corporation formed under the laws of California, and it is a
19  resident of Los Angeles County, California.  In addition, TWOF, by its actions against
20  Plaintiff, as detailed herein, has expressly aimed its activities at this Court's judicial
21  district, thus purposely availing itself of this Court's forum.

22  5.     Venue is proper in this judicial district because Defendants are subject to
23  the Court's personal jurisdiction.  28 U.S.C. §1391.

24  ## THE PARTIES

25  6.     Plaintiff is a Delaware limited liability company qualified to conduct
26  business in California and with its principal place of business located at 8811 Alden
27  Drive, Suite 12, Los Angeles, CA 90048.  Plaintiff is in good standing with the
28  California Secretary of State.

7.      Plaintiff is informed and believes, and on that basis alleges, that defendant Elizabeth Allen is an individual with an address of 2687 York Ave., Vancouver, BC V6K 1E6.

8.      Plaintiff is informed and believes, and on that basis alleges, that defendant There Once Was a Fern Inc. is a California corporation with its principal place of business located at 4605 Lankershim Blvd., #320, North Hollywood, CA 91602, which, at all times relevant to this action, served as defendant Elizabeth Allen's loan-out company.  Plaintiff alleges on information and belief that Allen owns, operates, and controls TOWF.

## **FACTS**

9.      Plaintiff develops, produces, and publishes unique entertainment content across various mediums, and has been creating original material since 2015.

10.     Plaintiff is the creator of the podcast entitled, "Small Town Dicks," which is based on the true experiences, stories, and relationships of two former detectives. Both former detectives are under contract with Plaintiff to provide services for the creation and production of the Program, and both have acknowledged and accepted Plaintiff's exclusive ownership of all intellectual property rights in and to the Program.

11.     Plaintiff is the owner of the trademark registration for the standard character mark SMALL TOWN DICKS (Reg. No. 5464581) issued by the United States Patent and Trademark Office on May 8, 2019, and covering the following services: Entertainment services, namely, providing podcasts in the field of true crime stories.  Plaintiff is also the owner of the trademark application for SMALL TOWN DICKS (Serial No. 87667050) filed at the United States Patent and Trademark Office on October 31, 2017, and covering the following goods/services: Digital media, namely, CDs, DVDs, downloadable audio and video recordings, featuring true crime stories; Mugs; and Production of live-action, drama motion picture theatrical films; Entertainment services, namely, the provision of continuing live-action programs featuring true crime stories delivered by television, internet, and video-on-demand;

Presentation of live theatrical performances.

12.    In or about April of 2017, Plaintiff and Defendants entered into negotiations for a contractor agreement (the "Agreement"), whereby Allen would provide to Plaintiff "producer services, hosting services, editing of the podcasts and marketing the [Program], including, without limitation, on social media and otherwise." The negotiations resulted in a written draft of the Agreement which was circulated to Allen. However, due to the close personal relationship between Allen and Yeardley Smith, a member of Plaintiff, production on the program commenced without Allen having signed the Agreement. A true copy of the unsigned Agreement is attached hereto as **Exhibit "A"**.

13.    By the terms of the Agreement, "all rights in [the materials created by Defendant Elizabeth Allen], including without limitation, all Intellectual Property Rights, shall be the sole property of Company, and that Company shall be free to use, exploit or dispose of such rights, in whole or in part, as Company may desire …."

14.    The Agreement explicitly stated that the materials created by Defendant Elizabeth Allen were to be considered a work made for hire under the Copyright Act of 1976, and that "Company shall be the owner without limitation of any kind of all rights in and to all [materials] and Company … shall have the exclusive right to exploit the [materials] in all media and means, whether now known or hereafter devised, throughout the world in perpetuity."

15.    The Agreement further contained an irrevocable grant to Plaintiff of the perpetual right to use Defendant Elizabeth Allen's "name, photograph and other picture (whether still or motion), performances, actions, appearances, image, likeness, voice, sounds and biographical information (no matter how any of the foregoing are depicted or portrayed)" in connection with the Program.

16.    Despite the fact that she never signed the Agreement, Allen was in possession of the circulated draft and never objected to or complained about any of its provisions. Further, Allen performed production, hosting, editing, and marketing

1   service for Plaintiff for the Program over the following two years, and Plaintiff paid

2   Allen all monies owed as stipulated in the Agreement.  At Allen's instruction, such

3   payments were made to her loan-out company, TOWF.

4       17.     Pursuant to the Agreement, Allen was to receive twenty percent (20%) of

5   all Profit (as defined in the Agreement) actually received by Plaintiff with respect to

6   the commercial exploitation of the Program.

7       18.     On or around February 27, 2019, Allen — despite being the only

8   individual involved with the Program who was paid cash for her services in addition

9   to being offered profit-participation — e-mailed Plaintiff's member to demand a larger

10  share of the profits from the commercial exploitation of the Program.

11      19.     On March 2, 2019, Allen sent an additional e-mail to the same individuals

12  as her prior e-mail, and in response to their question regarding Allen's self-appointed

13  title of "co-creator", she stated: "'Co-creator' is a term I've been using in the context

14  of the industry definition, which I understand to be someone who pitches a show and

15  sees it through."

16      20.     Despite Plaintiff's good faith efforts to negotiate with Allen, she rejected

17  each of Plaintiff's proposals for Allen to share in the profit generated by the Program.

18      21.     In response to Allen's rejection, on March 5, 2019, Plaintiff's counsel e-

19  mailed Defendants' counsel with notice that Defendant Elizabeth Allen's services in

20  connection with the Program were terminated.  Defendants' counsel responded by

21  alleging that Defendant Elizabeth Allen was a "co-creator of the Program and

22  retain[ed] full rights" therein, and that Plaintiff "may not unilaterally exploit the rights

23  in the Program …without [Defendant Elizabeth Allen]'s express approval and

24  agreement."  Attached hereto as **Exhibit "B"** is a true copy of the e-mail exchange

25  with defense counsel on March 5, 2019.

26      22.     Sometime after the March 5 e-mail exchange, Plaintiff attempted to log

27  on to its Twitter, Instagram, and Libsyn accounts for the Program, only to find that the

28  passwords to all of Plaintiff's accounts had been changed by Defendant Elizabeth

Allen.

## COUNT I

### Declaratory Judgment That Plaintiff Is The Sole Owner Of All Right, Title And Interest In And To The Program And Any And All Other Intellectual Property Rights Thereto

23.     Plaintiff repeats and incorporates by reference the allegations set forth in Paragraphs 1-22 as though fully set forth herein.

24.     The understanding between Plaintiff and Allen — as evidenced by the full performance of the terms of the Agreement for nearly two years — was that Plaintiff would be the sole owner of the Program and all intellectual property related thereto.

25.     Not only has Allen not alleged any promise from Plaintiff to compensate her for disclosure of an idea for the Program, but she has also consented to the terms of the Agreement, which state that Plaintiff is the sole owner of all ideas for the Program.

26.     In Allen's March 2 email demanding a higher profit-share, Allen, when discussing the profit-share outlined in the Agreement, stated that she "agreed to that arrangement…."

27.     It was not until Allen began to demand a higher profit-share that she began to label herself as a "co-creator".

28.     Despite having no ownership over the Program, Defendants claim that they are the co-creator of the Program and therefore retain an interest in it.  Moreover, in direct conflict with the terms of the Agreement, Defendants claim that Plaintiff may not exploit its rights in the Program without Defendants' express approval.

29.     An actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants concerning whether Plaintiff is, indeed, the sole owner of all right, title and interest in and to the Program, and any and all other intellectual property rights thereto.

30.     In light of the facts alleged herein, the dispute between Plaintiff and Defendants is definite, immediate and substantial.

31.     By this Complaint, Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. §2201(a) that Plaintiff is the sole owner of all right, title, and interest in and to the Program, including, without limitation, the copyright therein, and any and all other intellectual property rights thereto.

32.     Plaintiff is entitled to a declaratory judgment of its rights under 28 U.S.C. §2201 in order to resolve the dispute existing between the parties and afford relief from the uncertainty and harm that Defendants' allegations have caused.

### COUNT II
Declaratory Judgment That Plaintiff May Fully Exploit The Program
Without Interference From Defendants

33.     Plaintiff repeats and incorporates by reference the allegations set forth in Paragraphs 1-32 as though fully set forth herein.

34.     The Program, including the copyright therein and thereto, is the sole property of Plaintiff, and Defendants have expressly agreed that, as between the parties to this lawsuit, Plaintiff has all necessary right, title and interest to fully exploit the Program.

35.     Defendants have now alleged that they retain an interest in the Program, such that Plaintiff may not exploit it without the permission of either or both Defendants.

36.     An actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants concerning whether Defendants have any ownership of the Program or the right to limit Plaintiff's ability to exploit the Program.

37.     In light of the facts alleged herein, the dispute between Plaintiff and Defendants is definite, immediate and substantial.

38.     By this Complaint, Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that Plaintiff may fully exploit the Program without interference from Defendants, including, but not limited to the filing of copyright, trademark, or right of publicity claims against Plaintiff.

39.     Plaintiff is entitled to a declaratory judgment of its rights under 28 U.S.C.

§2201 in order to resolve the dispute existing between the parties and afford relief from the uncertainty and harm that Defendants' allegations have caused.

## COUNT III
### If Defendants Have Any Rights in the Program, They Have Licensed Those Rights On Terms Consistent With the Agreement

40.     Plaintiff repeats and incorporates by reference the allegations set forth in Paragraphs 1-39 as though fully set forth herein.

41.     Given that Allen, in exchange for her services provided, explicitly agreed to accept twenty percent (20%) of all Profits actually received and retained by Plaintiff with respect to the exploitation of the Program, if the Court determines that Defendants have any rights in the Program, then such rights have been licensed to Plaintiff.

42.     An actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants concerning whether Plaintiff is, indeed, the sole owner of all right, title and interest in and to the Program, and any and all other intellectual property rights thereto.

43.     In light of the facts alleged herein, the dispute between Plaintiff and Defendants is definite, immediate and substantial.

44.     By this Complaint, Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. §2201(a) that if Defendants have any rights in the Program, they must license those rights on terms consistent with the Agreement.

45.     Plaintiff is entitled to a declaratory judgment of its rights under 28 U.S.C. §2201 in order to resolve the dispute existing between the parties and afford relief from the uncertainty and harm that Defendants' allegations have caused.

## PRAYER FOR RELIEF

Therefore, Plaintiff Q and Shu Global Industries, LLC prays for judgment against Defendants There Once Was a Fern Inc. and Elizabeth Allen as follows:

1.     For declaratory judgment that Plaintiff is the sole owner of all right, title

and interest in and to the Program, including, without limitation, the copyright therein, and any and all other intellectual property rights thereto;

2. For declaratory judgment that Plaintiff may fully exploit the Program without interference from Defendants;

3. For declaratory judgment that if Defendants have any rights in the Program, they have licensed those rights to Plaintiff on terms consistent with the Agreement.

4. Such other relief as this Court deems just and proper.


Dated: April 24, 2019                    WEINBERG GONSER LLP


                                         By:   /s/ Douglas Lipstone
                                             Douglas M. Lipstone
                                             Bryan B. Bitzer
                                             Attorneys for Plaintiff
                                             Q AND SHU GLOBAL INDUSTRIES,
                                             LLC

1

## **DEMAND FOR TRIAL BY JURY**

2       Plaintiff hereby demands a trial by jury on all issues in Plaintiff's Complaint

3   that are triable by jury.

4   Dated: April 24, 2019                WEINBERG GONSER LLP

5

6                                   By:  /s/ Douglas Lipstone

7                                        Douglas M. Lipstone
                                         Bryan B. Bitzer
8                                        Attorneys for Plaintiff
                                         Q AND SHU GLOBAL INDUSTRIES,
9                                        LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "A"

**AGREEMENT**

This contractor agreement, consisting of these "Basic Terms," and the attached "Standard Terms and Conditions" (collectively, the "Agreement") dated as of April ___, 2017 ("*Effective Date*") is by and between Q and Shü Global Industries, LLC, a Delaware limited liability company dba Paperclip Limited with an address of 8811 Alden Drive, Suite 12, Los Angeles, CA 90048 ("*Company*" or "*Paperclip*") and Elizabeth Allen with an address of _____ ("*Contractor*"). Capitalized terms used in this Agreement have the meanings specified in Section 1 of the Standard Terms and Conditions or elsewhere in this Agreement. Contractor and Company are sometimes referred to collectively herein as the "Parties" and each is sometimes referred to herein as a "Party".

<u>**BASIC TERMS**</u>

1. Services:

During the Term (as defined herein), Company hereby engages Contractor, and Contractor hereby agrees, to perform the services set forth herein in connection with the creation of audio and audiovisual materials for Company's podcast currently entitled "Small Town Dicks" (the "Project"). Contractor's services shall include: producer services, hosting services, editing of the podcasts and marketing the Project, including, without limitation, on social media and otherwise (the "Services").

2. Compensation:

Company will pay Contractor a fee of two thousand dollars ($2,000) per episode during the Term for services rendered in connection with this Agreement. Contractor shall submit an invoice to Company on a on a monthly basis and such invoices shall be paid within ten (10) days of Company's receipt and approval of the same. Additionally, Contractor will receive twenty percent (20%) profit participation for the life of the Project as set forth on Exhibit A attached hereto and incorporated herein by reference. Moreover, so long as Contractor fully performs the Services, Contractor shall be attached to a subsequent production of the Project (e.g. television, film etc…) as a producer (level to be determined) and the fee for such producing services shall be subject to good faith negotiation, per customary parameters as are standard within the entertainment industry.

3. Term:

This Agreement shall commence on the Effective Date and shall run for an initial period of one (1) year (the "Initial Term"), and shall automatically extend for additional one (1) year periods (each an "Extension Term," and, together with the Initial Term, the "Term"), unless either Company or Contractor terminates the term via notice delivered no more than one hundred twenty (120) days and no fewer than thirty (30) days prior to the end of the Initial Term or the then-current Extension Term. Either Company or Contractor may terminate the Term at any time and for any or no reason upon thirty (30) days written notice to the other Party. Certain provisions of this Agreement shall survive the expiration or termination of the Term or this Agreement as set forth in Section 16 of the Standard Terms and Conditions.

4. Expenses:

Company shall reimburse or pay directly for expenses incurred by Contractor in performing Services pursuant to this Agreement, <u>provided, however</u>, that Contractor obtains prior written approval (which may include an email) from Company, prior to incurring any such expense and Company receives verification of all expenses (e.g., receipts, invoices) as the Company may require in order to qualify such expenses as deductible business expenses.

5. Standard Terms:

The remainder of the terms and conditions of this Agreement are those set forth in the Standard Terms and Conditions attached hereto and incorporated herein by this reference.

IN WITNESS WHEREOF, subject to and incorporating the Standard Terms and Conditions, which the Parties have read, approve and accept in all respects, the Parties have duly accepted and agreed to these Basic Terms and Standard Terms and Conditions and agree to be bound hereby as of the Effective Date.

Q and Shü Global Industries, LLC                                     Contractor
    a Delaware limited liability company


By: _____          _____
    Yeardley Smith, authorized member                   Elizabeth Allen

1

STANDARD TERMS AND CONDITIONS

1.      Definitions: Capitalized terms used in this Agreement have the meanings specified in this Section or elsewhere in this Agreement.

      1.1.      *"Affiliates"* means any corporation, limited liability company, partnership or other entity controlled by, controlling or under common control with Company.

      1.2.      *"Claims"* means any claims, demands, suits, criminal or civil actions or similar proceedings that might be alleged by a third party (including enforcement proceedings by any governmental authority), and all liabilities, damages, fines, penalties, costs or expenses that a Party might incur, become responsible for, or pay out for any reason, related to this Agreement.

      1.3      *"Colleague"* means all Persons who work with or for Company, including, without limitation, any Person who contributes to the Project.

      1.4.      *"Company Materials"* means all projects, documents, concepts, ideas, programs, products, formulas, presentations, customer lists, vendor lists, models, designs, inventions, reports, notes, compilations, sketches, Work Product and other materials of any kind or character that Contractor has contributed to, made or conceived in connection with this Agreement, including, without limitation, designs, audiovisual materials, programming, formulas, marketing materials, supplier lists, prospect lists, contact information, contract documents, contact lists and other business development documents, regardless of whether or not such materials are Confidential Information.

      1.5.      *"Create"* means: (i) invent or discover, for an Invention that is the subject matter of patent; (ii) create (as defined in 17 USC §101) for an Invention that is the subject matter of copyright; (iii) invent, discover or create, as applicable, for an Invention that is the subject matter of trade secrets; or (iv) design or create, for an Invention that is a Mark.  Other forms of the word "Create" (e.g., Created, Creation, etc.) shall have substantially the same meaning as required by the context.

      1.6.      *"Force Majeure"* means any cause beyond the reasonable control of the Parties, including, without limitation, an act of nature, fire, labor dispute, civil commotion, act of war, act or threat of terrorism, epidemic, national day of mourning, or embargoes.

      1.7.      *"Intellectual Property Rights"* means all intellectual property rights throughout the universe, whether existing under intellectual property, unfair competition or trade secret laws, or under statute or at common law or equity, including but not limited to: (i) copyrights, trade secrets, trademarks, trade names, Marks, patents, rights in inventions, rights in designs, rights in logos and trade dress, "moral rights," rights in mask works, rights of personality, publicity or privacy, and any other intellectual property and proprietary rights; (ii) any application or right to apply for, preserve, protect or secure any of the rights referred to in this clause; and (iii) any and all renewals, extensions and restorations thereof, now or hereafter in force and effect.

      1.8.      *"Invention"* means any idea, discovery, design, improvement, invention (including without limitation any discovery of new technology and any improvement to or new use for existing technology), information, Mark, know-how, innovation, writing, software, business process, procedure, work of authorship (*e.g.*, literary, graphical, designs, or audiovisual works, and sound recordings), compilation and other development or improvement, whether or not patented or patentable, copyrightable, or reduced to practice or writing.

      1.9.      *"Mark"* means any corporate name, trade name, logo, trademark, service mark, trade dress, domain name or the like, whether registered or unregistered.

      1.10.      *"Person"* means and includes any natural person, corporation, firm, joint venture, partnership, limited liability company, trust, unincorporated organization, government or any department, political subdivision or agency of a government.

      1.11.      *"Project"* has the meaning ascribed thereto in the Basic Terms.

2

1.12.    *"Services"* means all services performed by Contractor in connection with this Agreement.

1.13.    *"Work Product"* means each and every element created, contributed to or derived by or on behalf of Contractor or from Contractor's Services, whether made solely by Contractor or jointly with others in connection with this Agreement, including, without limitation, all Inventions conceived of, or Created: (i) as part of or for any Services or deliverables herein; or (ii) using any of Company's equipment, supplies, facilities or Confidential Information.

2.    <u>Services</u>: Contractor shall perform the Services in a professional and diligent manner, for and on behalf of Company's best interests. Company retains the right to inspect, stop or alter Contractor's Services to assure conformity with this Agreement, and as otherwise required to accomplish Company's business objectives. Contractor agrees to respond in a timely fashion to any and all requests made to Contractor by Company during the Term. Contractor shall direct all reports and other communications to Ben Cornwell at ben@pclipltd.com. If Company has provided Contractor with any samples, equipment, tools, materials or supplies in connection with the performance of Contractor's Services hereunder, Contractor shall maintain such items in good condition, normal wear and tear excepted, and promptly return any and all items provided to or on behalf of Contractor at the end of the Term. Contractor is expected to treat all Company employees, customers, vendors, clients, business partners and other contractors with respect and to act responsibly towards them. Contractor shall comply with all laws, ethical codes and company policies, procedures, rules or regulations, including those forbidding all forms of harassment, discrimination, and unfair business practices. Contractor acknowledges and agrees that Contractor shall have no power or authority to enter into contracts on behalf of, or otherwise bind Company in any manner. Contractor shall take no actions and make no statements or representations inconsistent with the provision of this Section 2. Contractor is free to accept projects and all other work from any Person unrelated to this Agreement so long as such work does not materially interfere with Contractor's performance of the Services during the Term.

3.    <u>Independent Contractor Status</u>:

3.1.    Contractor acknowledges and agrees that: (i) Contractor's Services are being provided as an independent contractor of Company; and (ii) that nothing in this Agreement shall be considered to create an employer-employee relationship, joint venture or any other agency relationship between Contractor and Company.

3.2.    Contractor hereby waives, and shall have no claim under this Agreement against Company for, workers' compensation, unemployment insurance or compensation, vacation time, vacation pay, sick leave, retirement benefits, health or life insurance, social security benefits, disability insurance benefits, or any other employee benefits relating to the Services Contractor shall perform in connection with this Agreement. This waiver is effective independent of Contractor's employment status as ultimately determined by any court or governmental agency for taxation or any other reason. Contractor acknowledges and agrees that Contractor is solely responsible for Contractor's income and other taxes and Company shall not withhold on behalf of Contractor any sums for income tax, unemployment insurance or social security pursuant to any law or requirement of any government agency including, without limitation, any unemployment insurance tax, federal, state or foreign income taxes, federal social security (FICA) payments or disability insurance taxes. Contractor further acknowledges that Company will report compensation paid to Contractor pursuant to this Agreement on Contractor's 1099 at the end of the calendar year in which Contractor's Services were provided. Contractor shall make such tax payments as may be required by applicable law and shall indemnify and hold Company harmless from any liability that may be incurred as a consequence of Contractor's failure to make such payments.

4.    <u>Work Product</u>: Contractor will promptly and fully disclose to Company all Work Product. Contractor acknowledges that it is the intention of the Parties that by operation of this Agreement that, as between Contractor and Company, all rights in each Work Product, including without limitation, all Intellectual Property Rights, shall be the sole property of Company, and that Company shall be free to use, exploit or dispose of such rights, in whole or in part, as Company may desire, including, without limitation, licensing or assigning some or all of such rights to one or more third parties. The Parties agree that Contractor is undertaking the creation of each Work Product at Company's special request, that the creation of the Work Product shall be within the scope of Company's engagement of Contractor, and that the completed Work Product shall be considered a "work made for hire" under the Copyright Act of 1976 (the "*Copyright Act*"). Company shall be the owner without limitation of any kind of all rights in and to all Work Product

and Company and its licensees, Affiliates, assigns and successors shall have the exclusive right to exploit the Work Product in all media and means, whether now known or hereafter devised, throughout the world in perpetuity. Contractor specifically agrees that for any Work Product or part thereof that does not qualify as a "work made for hire" under the Copyright Act, Contractor, for good and valuable consideration, the receipt and sufficiency of which Contractor hereby acknowledges, does hereby: (i) transfer and assign to Company all right, title and interest therein, including copyright; (ii) waive all moral rights (whether now existing or later acquired) in each Work Product and in any derivative works, including any rights of attribution and integrity under Section 106A of the Copyright Act, 17 U.S. C. § 106A; and (iii) agrees to execute any further documentation requested by Company. Contractor waives and agrees not to exploit any moral rights Contractor may have or later acquire against any Person, including Company. Company shall be the copyright owner of the Work Product for all purposes without limitation of any kind. The exclusive legal title and copyright to the Work Product and all secondary and derivative rights in the Work Product in any medium or format shall be in Company, which shall have to sole right to make whatever use thereof Company deems advisable, including but not limited to, modifying such Work Product, creation of derivative works based on the Work Product, and syndication or licensing of the Work Product to others. Upon Company's request and at its expense during this Agreement and thereafter, Contractor will assist Company and their agents in their efforts to perfect, preserve and protect title and ownership in the Work Product, including all rights in and to the Intellectual Property Rights throughout the world, and upon notice and opportunity to comment (not to exceed five (5) business days) Contractor agrees to execute, without any further consideration, such assignments or documents of title as may be requested by Company. In furtherance of this provision, Contractor hereby appoints Company as its true and lawful attorney in fact for the sole and limited purpose of executing any documents or taking any such actions that may be necessary to accomplish any of the foregoing in the event that Contractor shall fail to fully comply with this Section 4. All costs associated with such documents, applications or registrations shall be borne by Company. This power of attorney is coupled with an interest, is irrevocable, and shall survive the termination or expiration of this Agreement. Contractor will keep complete, accurate, and up-to-date records in the form requested by Company for all Work Product. Contractor understands that such records, and all copies thereof, are the exclusive property of Company. Contractor will provide copies of such records to Company as and when requested by Company, and at the end of the Term.

5.    Confidential Information:

    5.1.    Contractor understands and acknowledges that it may have access to information concerning Company that either is confidential or constitutes a trade secret, including, without limitation, all Company Materials, product specifications and information about Company's business and marketing plans, including, without limitation, the Project, and any information regarding all Colleagues (whether professional or personal) and each of his, her or their families or affiliates (each Colleague and their respective family or affiliate(s) are collectively referred to herein as the "Colleague Parties") (collectively, "*Confidential Information*"). In consideration of Contractor's engagement by Company, Contractor agrees to keep confidential any and all Confidential Information. Confidential Information shall not be used by Contractor for any purpose not related to the business interests of Company nor shall Contractor disclose or reveal any Confidential Information for reasons not related to the business interests of Company, even in the course of casual discussions, to any Person, whether during Contractor engagement by Company or at any time thereafter. If at any time Contractor becomes aware of any unauthorized use, disclosure or communication of any Confidential Information by any third party, Contractor agrees to immediately inform Company of such use, disclosure or communication. All Confidential Information shall be Company's exclusive property. No Confidential Information will be made available by Contractor to others during or following Contractor's engagement by Company without the advance written permission of Company. Contractor agrees that Contractor shall not remove, reproduce, summarize or copy any Confidential Information except as expressly required by Company in order to enable Contractor to perform the Services. Contractor agrees to return immediately to Company all Confidential Information, including duplicates, at the expiration or termination of this Agreement, or whenever Company may otherwise require that such Confidential Information be returned.

    5.2.    Any and all information described in Section 5.1 above, including, without limitation, any and all pictures, recordings, records, documents, or other information relating to any Colleague Parties' personal life or entertainment services, or other services performed by such Colleague Party, or by any person, firm or corporation doing business with or in any way related to or associated with Company, whether prepared by Contractor or otherwise coming into Contractor's possession, is and shall remain Company's sole and exclusive property and shall not be used, disclosed, removed or copied by Contractor without Company's prior written consent.  Without limiting the foregoing,

4

except solely in the performance of Contractor's Services for Company with respect to the Project, Contractor shall not photograph, tape, film or otherwise record any likeness or activities of any Colleague Party.

5.3.    Further, Contractor shall not, without Company's prior written consent, give any interviews (whether oral or written), write or prepare or assist in the preparation of any books or articles, or make any remarks of any kind, regardless of medium, which interviews, books, articles or remarks concern or discuss Company, the Project, or any Colleague Party.  **THE FOREGOING EXPRESSLY INCLUDES, WITHOUT LIMITATION, COMMUNICATIONS APPEARING ON THE INTERNET VIA BLOGGING OR SOCIAL NETWORKING SITES, INCLUDING, WITHOUT LIMITATION, FACEBOOK, INSTAGRAM AND TWITTER**.

5.4.    Contractor acknowledges that, due to the particular nature of the entertainment industry, any disclosure or dissemination by Contractor of any Confidential Information or material in connection with the Services will deprive Company of the right to use such Confidential Information or material.  Therefore, it would be important and necessary to prevent Contractor from disclosing or disseminating such Confidential Information or material.  Contractor also understand that it may be necessary to have a court order to stop Contractor from doing such acts.

6.    <u>Insurance</u>: During the Term, Contractor shall maintain, at its own expense, workers' compensation insurance in statutory benefits limits of the applicable labor codes and workers' compensation laws.

7.    <u>Name and Likeness</u>: Contractor hereby irrevocably grants Company the perpetual right, without further compensation, to use Contractor's name, photograph and other picture (whether still or motion), performances, actions, appearances, image, likeness, voice, sounds and biographical information (no matter how any of the foregoing are depicted or portrayed) in connection with any exercise of rights granted to or otherwise vested in Company hereunder, including, without limitation, in connection with the development, production, advertisement, publicity, promotion and other exploitation of the Project or the results and proceeds of Contractor's Services.

8.    <u>Publicity; Non Disparagement</u>: Contractor shall not use, authorize, issue, confirm or deny any statements, interviews, news articles, press releases, publicity or other information of any kind regarding Company, the Project (including, without limitation, the subject matter thereof), or the Services, <u>provided, however</u>, that incidental mentions of Contractor's engagement by Company with respect to the Project may be excepted from Contractor's confidentiality obligation herein by Company in Company's reasonable discretion.  Contractor shall not make any statement (orally or in writing) or take any action that in any way disparages or which could reasonably be expected to harm the reputation or goodwill of Company, the Project, or any Colleague Party, including, but not limited to, causing or encouraging others to make disparaging statements about Company, the Project, Colleague and/or the Colleague Parties (or any of them).  For the purposes of this Agreement, the term "disparage" includes, but is not limited to, comments or statements (conveyed by any means) to the public, press, media, or to any individual or entity that has or may have a business or personal relationship with any of Company, Colleague and/or the Colleague Parties (or any of them), including, but not limited to, any employee of Company or Colleague Party, that may adversely affect in any manner: (i) the personal or business reputation of any of Company, the Project, or any Colleague Party; or (ii) the businesses of Company or any Colleague Party.

9.    <u>FCC</u>: Contractor has not accepted or paid or agreed to accept or pay, nor will accept or pay or agree to accept or pay, any money, service or other valuable consideration as defined in Section 507 of the Federal Communications Act of 1934, as amended, for the inclusion of any matter in the Project, other than payment by Company to Contractor.

10.    <u>Representations and Warranties</u>:

10.1.    Contractor represents, warrants, covenants, understands and agrees that: (i) Contractor is free to enter into this Agreement and to perform Contractor's obligations herein; (ii) Contractor is not obligated or a party to any engagement, commitment or agreement with any Person that will, does or could conflict with or interfere with Contractor's full and faithful performance of this Agreement; (iii) other than as required by law, Contractor shall not at any time divulge, directly or indirectly, any of the terms of this Agreement to any Person other than Contractor's legal counsel or other professional service providers; (iv) Contractor shall not use any material or content of any kind in the course of Contractor's work or the Services, or in any Work Product, that is copyrighted or owned or licensed by a Person other than Company or Contractor, or that would or could infringe the rights of any other Person; (v) all Work Product (1) will be the original work of Contractor and will be free and clear of any and all claims or

encumbrances of any kind; and (2) will not infringe the Intellectual Property Rights or other proprietary rights of any third party; (vi) Contractor shall not use in the course of Contractor's performance under this Agreement or in the Services, and shall not disclose to Company, any confidential information or trade secret belonging, in part or in whole, to any third party; (vii) no statement, representation, promise, or inducement has been made to Contractor, in connection with the terms of this Agreement, the execution hereof or otherwise, except as is expressly set forth in this Agreement; (viii) as of the Effective Date of this Agreement, Contractor is and will continue at all times to comply with all laws, ordinances, rules, regulations, orders, licenses, permits, judgments, decisions or other requirements of any governmental authority, governing body or jurisdiction applicable to Contractor or the Services (collectively, all "*Applicable Laws*"), whether those Applicable Laws are now in effect or later come into effect; (ix) all work performed by Contractor in connection with this Agreement, including, without limitation, the Services, shall be performed exclusively by Contractor; (x) Contractor acknowledges that Company is not a signatory to any union or guild agreement having jurisdiction over the services to be provided hereunder or any exploitation of the Project hereunder and Contractor is not a member of any guild, union or association that requires any additional payments from Company or Contractor in connection with Contractor's services or any exploitation of the Project hereunder; and (xi) **CONTRACTOR UNDERSTANDS ALL OF THE TERMS OF THIS AGREEMENT AND HAS REVIEWED THIS AGREEMENT FULLY AND IN DETAIL AND HAD THE OPPORTUNITY TO CONSULT QUALIFIED AND INDEPENDENT LEGAL COUNSEL PRIOR TO AGREEING TO EACH AND ALL OF THE PROVISIONS OF THIS AGREEMENT**.

10.2. Company represents, warrants, covenants, understands and agrees that Company: (i) is a limited liability company; and (ii) is duly authorized and free to enter into this Agreement.

11. Indemnification: Contractor shall indemnify and hold harmless Company and its Affiliates, licensees, successors and assigns, and each of their members, managers, shareholders, employees and officers for, from and against any and all Claims, arising out of or in connection with: (i) Contractor's malfeasance, willful misconduct, or gross negligence; or (ii) Contractor's breach of any provision of this Agreement. This indemnification obligation shall survive the expiration of the Term or the termination of this Agreement. Contractor further agrees to reimburse Company, within fifteen (15) days of each demand for reimbursement, for any and all costs, liabilities, expenses, fees, fines, professional fees and other amounts paid or incurred by Company (or such other indemnitee) in connection with the foregoing indemnity.

12. Governing Law, Legal Proceedings and Remedies:

12.1. THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF THE STATE OF CALIFORNIA AND THE UNITED STATES OF AMERICA APPLICABLE TO CONTRACTS MADE AND PERFORMED ENTIRELY IN CALIFORNIA SHALL GOVERN: (i) THE VALIDITY AND INTERPRETATION OF THIS AGREEMENT; (ii) THE PERFORMANCE BY THE PARTIES OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER; AND (iii) ALL OTHER CAUSES OF ACTION (WHETHER SOUNDING IN CONTRACT OR IN TORT) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TERMINATION OF THIS AGREEMENT.

12.2. The Parties agree that any and all disputes or controversies of any nature between them arising at any time (whether or not relating to any Work Product, Project or to any other matters in connection with this Agreement), shall be determined by binding arbitration in accordance the rules of JAMS (or, with the agreement of the Parties, ADR Services) before a single neutral arbitrator ("*Arbitrator*"). The Arbitrator shall be an attorney with at least ten (10) years' experience in the entertainment industry or a retired judge and shall be mutually agreed upon by Company and Contractor. If Company and Contractor are unable to agree on an Arbitrator, the Arbitrator shall be appointed by the arbitration service. The fees of the Arbitrator shall be borne equally by Company and Contractor, provided, that the Arbitrator may require such fees be borne in such other manner as the Arbitrator determines is required in order for this arbitration clause to be enforceable under applicable law. The Parties shall be entitled to conduct discovery in accordance with Section 1283.05 of the California Code of Civil Procedure, provided, that: (i) the Arbitrator must authorize all such discovery in advance based on findings that the material sought is relevant to the issues in dispute and that the nature and scope of such discovery is reasonable under the circumstances; and (ii) discovery shall be limited to depositions and production of documents unless the Arbitrator finds that another method of discovery (*e.g.*, interrogatories) is the most reasonable and cost efficient method of obtaining the information sought. There shall be a record of the proceedings at the arbitration hearing and the Arbitrator shall issue a Statement

of Decision setting forth the factual and legal basis for the Arbitrator's decision. The Arbitrator's decision shall be final and binding as to all matters of substance and procedure, and may be enforced by a petition to the Superior Court for confirmation and enforcement of the award. The Arbitrator shall have the power to enter temporary restraining orders, preliminary and permanent injunctions, subject to the provisions of this Agreement waiving or limiting that remedy. Prior to the appointment of the Arbitrator or for remedies beyond the jurisdiction of an arbitrator, at any time, Company may seek *pendente lite* relief in a court of competent jurisdiction in Los Angeles County, California without thereby waiving its right to arbitration of the dispute or controversy under this Section 12.2. All arbitration proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed, except as necessary to obtain court confirmation of the arbitration award. **CONTRACTOR UNDERSTANDS THAT BY AGREEING TO ARBITRATION IN THE EVENT OF A DISPUTE BETWEEN COMPANY AND CONTRACTOR, CONTRACTOR IS EXPRESSLY WAIVING CONTRACTOR'S RIGHT TO REQUEST A TRIAL BY JURY IN A COURT OF LAW.** If, notwithstanding the arbitration provisions of this Agreement, a Party shall succeed in bringing an action relating to any matter or dispute in connection with this Agreement in a court of law, then the venue for resolution of such matter or dispute shall be the State or Federal Courts located in Los Angeles, California.

12.3.    Contractor acknowledges and agrees that a breach of any provision of this Agreement by Contractor will cause Company great and irreparable harm, for which Company will have no adequate remedy at law. Therefore, notwithstanding Section 12.2 and in addition to any other rights and remedies Company may have, Contractor agrees that Company, without posting any bonds, shall be entitled to obtain, and Contractor agrees not to oppose, a request for injunctive and other equitable relief to prevent a breach or continuing breach of this Agreement. Such remedies shall include, without limitation, the right to prevent the dissemination of any Confidential Information, before such information or materials are published. Further, in the event that Contractor shall breach or threaten to breach any covenant in this Agreement, without limiting any other rights or remedies Company may have, Contractor shall be required to pay to Company damages in an amount to be determined by a court of competent jurisdiction. Finally, Contractor expressly agrees that, also without limiting any other rights or remedies Company may have, Company shall be entitled to recover any and all monies or other benefits whatsoever received by Contractor or on Contractor's behalf from any and all sources in connection with any use or dissemination by Contractor of any Confidential Information and that any such monies or other benefits so received by Contractor or on Contractor's behalf shall be held, in trust, by Contractor or on Contractor's behalf for immediate payment over to Company. Notwithstanding anything to the contrary contained in this Agreement, any remedy that Contractor shall have against Company in connection with this Agreement, including, without limitation, in connection with the Services, or the Project, shall be limited to the right to recover damages, if any, in an action at law pursuant to the arbitration procedure set forth in Section 12.2, and Contractor hereby irrevocably waives, in perpetuity pursuant to any applicable law throughout the universe, any right or remedy in equity, including: (i) the right to terminate this Agreement; (ii) to rescind Company's right, title and interest in and to Contractor's Services or Work Product; (iii) any right of droit moral or any similar right Contractor may have with respect to the results and proceeds of Contractor's Services, including, without limitation, any moral right of accreditation; or (iv) the right to enjoin, restrain or otherwise impair in any manner the production, distribution, advertising or exploitation of any Work Product, Project or any parts or elements of either thereof.

13.    <u>Limitation of Liability</u>: IN NO EVENT SHALL COMPANY BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING, WITHOUT LIMITATION, ANY DAMAGES BASED ON LOSS OF PROFITS, LOSS OF USE, BUSINESS INTERRUPTION OR LOSS OF DATA), EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND COMPANY'S LIABILITY TO CONTRACTOR FOR A CAUSE OF ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL NOT EXCEED THE AMOUNTS ACTUALLY PROVEN TO BE OWED AND UNPAID BY COMPANY TO CONTRACTOR UNDER THIS AGREEMENT. THE FOREGOING LIMITATIONS SHALL APPLY REGARDLESS OF THE CAUSE OR THE FORM OF ACTION (WHETHER BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE).

14.    <u>Force Majeure</u>: In the event of the occurrence of an event of force majeure (as that term is understood in the entertainment industry in Los Angeles, California), Company shall have the right to suspend the Term and shall have the right, but not the obligation, to extend the Term by the length of any such suspension. If an event of force majeure continues for three (3) consecutive weeks, either Party shall have the right to terminate this Agreement.

15.     Assignment: This Agreement is non-assignable by Contractor and any purported assignment shall be null and *void ab initio*. This Agreement shall inure to the benefit of Company, its successors, assignees, licensees and grantees and associated, affiliated and subsidiary companies. Company may freely assign, license or otherwise transfer this Agreement, in whole or in part, and any or all of its rights hereunder to any Person.

16.     Survival: The following Sections shall survive the expiration or termination of the Term, or the termination of this Agreement: Sections 2 of the Basic Terms and Sections 1, 3, 4, 5, 7, 8, 10 through 17 of these Standard Terms and Conditions and Exhibit A.

17.     Miscellaneous: The Section headings in this Agreement are for convenience only and are not intended to be a complete or accurate summary of the contents of any Section. They shall not be used in construing this Agreement or any part hereof. Neither of the Parties hereto has made any representations, statements, warranties or other agreements other than those expressed herein. This Agreement embodies the entire understanding of the Parties with respect to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, or understandings, written or oral, between Contractor and Company or its Affiliates. This Agreement may be amended, modified or canceled only by a written agreement signed by the Parties hereto. Except as otherwise provided in this Agreement, all notices and other communications hereunder shall be in writing and shall be deemed given when delivered personally or if delivered by overnight delivery (by a nationally recognized overnight courier) when delivery is confirmed by the delivery service to the addresses specified in the Basic Terms, or at such other address as either Party may supply by written notice delivered in accordance herewith. If any provision of this Agreement, or portion thereof, shall be held invalid or unenforceable by a court or arbitrator of competent jurisdiction, such invalidity or unenforceability shall attach only to such provision or portion thereof, and shall not in any manner affect or render invalid or unenforceable any other provision of this Agreement or portion thereof, and this Agreement shall be carried out as if any such invalid or unenforceable provision or portion thereof were not contained herein; provided, however, that if such provision is a material business term (e.g. compensation, restrictions, "work made for hire," confidential information, etc…), such invalid or unenforceable provision or portion thereof shall be deemed, without further action on the part of the Parties hereto, modified, amended or limited to the extent necessary to render the same valid and enforceable, provided, that any such modification, amendment or limitation preserves the original intent of the Parties (as demonstrated by the plain meaning of the text). No waiver by a Party hereto of a breach or default hereunder by the other Party shall be considered valid unless in writing signed by such first Party, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or any other nature. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Whenever examples are used in this Agreement with the words "including," "for example," "any," "each," "e.g.," "such as," "etc." or any derivation thereof, such examples are intended to be illustrative and not in limitation thereof, and "all" shall mean "any and all." All uses of the word "or" herein are as a logical disjunction unless otherwise specified. All references to the masculine, feminine or neuter genders shall mean and include all genders. The language used in this Agreement shall be deemed to be the language chosen by the Parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any Party hereto, including the drafter hereof.

[END OF STANDARD TERMS AND CONDITIONS]

EXHIBIT A
Profit Participation

Paperclip shall pay to Contractor twenty percent (20%) of all Profit (as defined herein) actually received and retained by Paperclip with respect to the exploitation of the Project. Paperclip shall make all such payments of Profit to Contractor (if any) within thirty (30) days of Paperclip's receipt of monies that constitute Profit.

Profit means gross revenue received and retained by Paperclip with respect to the exploitation of the Project AFTER such gross revenue has allowed Paperclip to recoup 125% (e.g. all funds plus 25% thereof) of all expenses and other monies funded by Paperclip in connection with the Project.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT "B"

27
28

**From:** Eric Suddleson <eric@ftsllp.com>
**Sent:** Tuesday, March 5, 2019 3:22 PM
**To:** Tye Gonser <tye@weinberg-gonser.com>
**Cc:** Sabrina Johnson <sabrina@ftsllp.com>
**Subject:** RE: Small Town Dicks

Dear Tye:  This is in response to your email to me from earlier today.  Please be advised that to my knowledge, no definitive agreement was ever reached between our clients respecting the podcast "Small Town Dicks" (the "Program"), and in fact no documentation was ever signed.  My client is a co-creator of the Program and retains full ownership of her rights therein.  Consequently, Paperclip Ltd. may not unilaterally exploit the rights in the Program (including any derivative rights therein) without my client's express approval and agreement.  I would be happy to discuss this matter further at your convenience.  In the meantime, I am obliged to note that this is not a complete statement of the facts of this matter and/or my client's rights, remedies and/or positions, all of which are hereby reserved to the fullest extent.

Regards,

Eric Suddleson

cc:  Elizabeth Allen

Eric Suddleson
eric@ftsllp.com



10880 Wilshire Blvd., Suite 2070
Los Angeles, California  90024
*TEL* 310.441.8000
*FAX* 310.441.8010

This e-mail message and its attachments are intended solely for the addressed recipient and may contain legally privileged and confidential information.  Any unauthorized use, disclosure or duplication is prohibited

**From:** Tye Gonser <tye@weinberg-gonser.com>
**Sent:** Tuesday, March 5, 2019 2:14 PM
**To:** Eric Suddleson <eric@ftsllp.com>
**Subject:** Small Town Dicks

Hi Eric,

My firm is counsel to Paperclip Ltd. I left a message with your assistant earlier today and I am still happy to chat if you like.

However, this email serves as notice from Paperclip Ltd. to your client There Once Was a Fern, Inc. ("TOWF") that:

1.  All of TOWF services, and those of its employee Elizabeth Allen, in connection with the podcast "Small Town Dicks" ("STD") are terminated immediately; and

2.  The offer to TOWF/Allen with respect to MFN participation in other exploitations of STD, which was never accepted by TOWF/Allen, is hereby expressly and immediately rescinded.

As I mentioned above, happy to setup a call if you like. thanks.

Best,

Tye

Tye Gonser
WEINBERG GONSER LLP
10866 Wilshire Blvd., Suite 1650
Los Angeles, CA 90024
424-239-2868 direct
424-238-3060 fax
850-321-0301 mobile
www.weinberg-gonser.com

NOTICE: This e-mail message and/or its attachment(s) may contain, link to or reference information that is legally privileged, proprietary, and/or confidential. If you are not the intended recipient of this email message or the person responsible for delivery of this email message to the intended recipient(s), (i) you are also hereby notified that any review, use, distribution or copying of Data (as defined below) by you is strictly prohibited, and (ii) we respectfully request and urge that you immediately notify the sender and destroy any and all tangible and intangible copies of Data in all formats, wherever located and however recorded or embodied, including without limitation Data that are or may become accessible to you or any of your affiliates via any and all (a) accounts and networks, (b) devices, computers, servers and the like, (c) memory, and (d) back-up, cloud or other storage systems connected to or associated with any of the foregoing. "Data" means and includes all or any portion of (i) this e-mail message, (ii) any and all attachments hereto, and (iii) any and all excerpts, notes and linked content relating to or associated with any of the foregoing.